of the contract, which is the patent assignment, and that appears at page 4048 of the appendix. It's paragraph 9 of the sub-R&D agreement, and the court may wish to reference that as we proceed. The introductory phrase is very important in that patent assignment. It says, on behalf of the partnership, the developer, in this case InterGATA, shall apply for and obtain patents. That means the assignment has to be interpreted for the benefit of the partnership, and the key to that interpretation is to take into account the essence of the deal, which was IBEP would provide research money in return for the research results, including commercial products. To be sure, IBEP gave InterGATA an option to purchase these discoveries, but that option was not exercised here, and that is not really an issue for the court. So if we start with the contract with the assignment language, the assignment covers patents  that form part of the proprietary information are assigned to IBEP. Certainly, Claim 1 of the 701 patent forms a part of the proprietary information. It covers TBP, which was discovered. Can I just stop you here? I mean, I don't. Yes. Yes, ma'am. I see it the other way around. I mean, isn't it that in this case, the proprietary information forms part of the patent, not the other way around? Well, I mean, I think in a way, it still falls within the terms of the contract, because if a patent includes proprietary information, that is, as one of the claims, then the patent forms a part of the proprietary information. I mean, that's the step you lose me. I mean, I guess I'm having a hard time seeing where anything in the agreement that you've referenced in your response or so forth gets you to that point, that you own, if there's a piece of proprietary information in any patent, that gives you exclusive ownership of the entire patent. I'm, which is the language that you say gives you that? If you look at the definition of proprietary information, which I believe is at 4043 of the appendix, it includes both patents and inventions. And so, if there is an invention that forms a part of the proprietary information, and that invention is in a patent, the patent then forms a part of the proprietary information. And that's based on the definition? Of proprietary information, which includes patents. But it doesn't say patents in which you have one invention. I mean, it lists a series of things that it could mean. And of course, proprietary information could cover patents. But why does that dispose of the question? I mean, that could mean patents in which, you know, all the discoveries, all the claims had come to fruition under the, you know, in 1987 or before. Where are you getting? Because the essence of the agreement was to ensure that the partnership take ownership of the proprietary information in whatever form, whether it be in an invention or whether it be in a claim as part of the patent. I mean, that was the deal. But in a way, it wasn't a bad deal because you gave Yeda the discretion to apply for patents. I think that's the actual term is discretion. So, they have the right to aggregate different inventions together. Well, certainly, they had to do it on behalf of the partnership. And inter-Yeda then made the decision to include for the benefit of the partnership claims two and three in the 701 patent. And from that, one can infer that inter-Yeda concluded that those claims resulted from the R&D programs. Isn't that too big a leap? I mean, in a way, you get more than you actually contributed. Theoretically, some of the inventions came afterwards, so you get a little bit more, but also you don't get the exclusivity. But the inventions, and the inventions we're talking about here, were purely for commercialization of the discovery. And according to the Palm, the private offering memorandum, I mean, that's what we were buying. No, it was a purification. One was a partial purification, and was it Rubenstein? Yes, it was Rubenstein. What was his name, I'm sorry? Contributed. In other words, he had the purification process. So he gave an inventive contribution. So he gets the patent. You get the patent. You just don't get it exclusively. No, first of all, he doesn't get the patent. Well, I mean, because, well, right, it goes up through. Yeah, it goes to inter-Yeda. Fair enough, but still, it's not exclusive to you, because you only get what you bargained for. Which was the inventions resulting from the R&D programs. There would not have been a Rubenstein's invention. Wait a minute, I'm sorry, go ahead, go ahead. Did you raise the result, I mean, I looked in your answer to the summary judgment motion on just the issue of resulting from, not the other issues you've talked about today, and I didn't see that you had raised that issue before the district court. In fact, we submitted the affidavit of Mr. Becker, and Mr. Becker's affidavit at the appendix of 4392 says he contributed seed money. His understanding was IBEP would own scientific discoveries, including patents and commercial products resulting from those discoveries. Well, but let's go to the language of the agreements. If I recall correctly, I think the resulting from language is only in the agreement that gives interest in the proceeds of any patent as opposed to ownership. Isn't that correct? No, no, Your Honor. Where do you, where's the language? No, I believe it's in paragraph 9A of the sub-R&D agreement, and it says, on behalf of the partnership, developers shall apply for and obtain patents in developer Edward Yator's name on all inventions resulting from the R&D program. Okay, but. There's nothing about revenues or just money. Right, but that's tied in turn to the proprietary information, correct? Well, yes. It says such patents that form a part of the proprietary. Now, I mean, clarify this for me. If I understand it correctly, if IBEP invests a million dollars in the project and subsequently someone else invests a million dollars in the project after IBEP's termination of its investment period. And something comes out of the $2 million investment, then you get an interest in the proceeds of whatever intellectual property comes out of that agreement, right? Only after the option to purchase has been exercised. Then we get our revenues. All right. But that's the only way we get our revenues. Okay, but that is different from, as I understand it, the provisions that deal with your proprietary interest in the patent. Right. In other words, if you. That's correct. What's difficult about this case is that the main work, presumably, at least it feels this way, that was during the period in which you were involved. And if, but suppose that you had been involved only at the very outset, for a very short period of time, just enough so that one out of 12 inventors, you could claim, you could point to as your guy, would you then have on your theory exclusive ownership of the entire patent? And if not, why not under your theory? Well, if I understand the question. Yeah, it was a rather convoluted question, I'm sorry. But you understand, I think. Well, go ahead, take a shot at it and I'll see. If there were a number of inventors involved in research during our time period, and they came up with a discovery, whatever that discovery was, we would own that discovery. Well, my question is, what would be your interest in, suppose that that discovery was enough to give you some interest in the patent, but the whole patent involved many more people with much more by way of discoveries and inventions that occurred after your tenure in the investment. Would you then have a claim to the entire patent? Well. And if not, why not under your theory? First of all, whether we would or not is a question of fact to the juror. The jury would have to decide resulting from the patent. Let me make sure that I, what I really want to know is why wouldn't you, on those facts, given your theory of the case, have a right to the entire patent? Or do you think you would? Well, again, if the work that was done subsequent to our discovery resulted from the R&D programs, we would have that right. And the work that's contemplated is work for commercialization, to bring those products to commercial. Even though it was not developed in the R&D program, that is to say when you were there. So, because I'm, my positing are all sorts of inventions that sure they developed, they emerged from the R&D program, but they were entirely separate inventions done long after you left the program. Do you still get them under your theory? Again, I think that that is a question of fact for the jury. I don't think that that's a issue that would be decided here. But that's a question of fact, and the fact, the operative fact being did they result from the initial, so if they. Here what we have is a series of purification steps performed during the sub-R&D agreement, which Wallach, the leader of the project says basically taught us a great deal about TVP, and helped us enrich TVP through various purification steps, and what Rubenstein did basically was a direct sequel that resulted from the R&D program. So here that question of fact resolves in our favor. With respect to Judge Bryson's question of fact, again, that would be a question for the jury. If it's really attenuated, if it has nothing to do with commercialization of that initial discovery, then we probably aren't, we don't have any claim to it. But it was turned entirely, as Judge Bruce said, on resulting from, so if the conclusion was resulting from, then it wouldn't matter that it was not developed in the R&D programs, which is the definition of proprietary information. No, resulting from and developing are basically synonymous terms. No, there's not a great deal of difference there. I would wonder about that, because something can result from a program, which somebody began five years ago and then left, but that person's involvement may have terminated five years ago, and that is not then developed in the R&D programs. The R&D programs defined as the period in which that person was involved, correct? Well, that depends on what was developed in the R&D programs, and if there were a series of purification steps, which then Rubenstein added to marginally, then I think the question for the jury is, was it developed in? So you're essentially challenging his naming as an inventor. You're challenging inventorship. No, no, no, no, no, I'm not, I'm not, I'm not challenging him as an inventor. I'm simply saying that his work simply built on the process that was started and continued during the sub-R&D agreement, and that qualifies as developed in for the jury. So you have some contract terms that say developed, I think, in the R&D programs, and then you have some language saying resulting from, and what you're urging us to do is to look at this pack of contracts and say that as long as it began during R&D, you get the rights to it. What I'm saying is that resulting from, inventions that result from the R&D programs under this assignment are proprietary information, and even if they're not. It doesn't say that when it defines proprietary information. Of course, you have to go to another contract to get that. No, I think the proprietary information basically talks about inventions and patents developed in. In the R&D program. And then the question becomes, what does developed in mean? And building on purification steps that were developed during our sub-R&D research period, certainly contributed mightily to what Rubenstein eventually came up with. And all of that then is thrown into the 701 patent, both the earlier purification steps, as well as the later. But doesn't that, what's that TOS, is that TOSS? I don't know what you're calling it. Yes, it is. Doesn't that then deal with the subsequent stages and give you certain rights afterwards? Because acknowledging that the research was going to continue. Here's what the TOSS says, and I think what's really important is to look at the language of the option that InterData had in the TOSS. And what it says is that InterData is entitled to proprietary information relating to products that are reduced to practice. Okay? That's the scope, which is similar to resulting from, because reduced to practice is defined. It's defined in the TOSS agreement as products. In fact, products that are ready for industrial scale-up. So that is a very broad option to exercise. And it mirrors the assignment, which IBEP basically, under that assignment, owns. That is, the commercialization part of a discovery. I mean, after all, that was the deal. I mean, we didn't go in there to fund a university. We went in there because we wanted commercial products. And if these folks are going to continue to commercialize, then we get that product. What if Mr. Rubenstein had worked for someone other than InterData? Different situation. Because? Because under Israeli law, Dr. Rubenstein worked for InterData, and his work basically passed by operation of law to InterData, and then by assignment to IBEP. But if he's working for somebody else, it doesn't pass to InterData, and then it doesn't pass by assignment to IBEP. So that's a really important point. I mean, he has to work for InterData. They admit he does. That was not disputed in the court below. They try to raise some issues now, but, you know, frankly, we didn't have any burden. Okay. Let me ask you another one. What if he had been hired by InterData after 1987? So he wasn't an employee during 1987. Different result? No. I think that the future rights to the 701 patent had been assigned at the time of the signing of the sub-R&D agreement, and as long as InterData had all of those rights, and they had to have all those rights, they could then assign all of those rights to IBEP. Very well. I'm into my... Well, we will restore your rebuttal time, or at least we'll give you a couple of minutes, depending on how much we appear to need. Let's see. Now, Mr. Groomridge, you were going to go first, and you have 12 minutes. Thank you, Your Honor, and good afternoon. What I want to start off with is by saying there's no dispute here that Rubenstein made an invention, and he made it after the sub-R&D agreement had expired, and the operative grant language of proprietary rights in the sub-R&D agreement and its companion, the TOS, according to him, says the only thing that's granted is stuff that's developed in the R&D program. And what about the language resulting? Absolutely. That's not a grant. That, and let's absolutely look at that. If we look at 4048 for the record, right, what it says, it talks about patents, and interestingly enough, in the outset, it's a different part of the agreement than the property rights, which appears on the next page, right? The granting of property rights is in a separate section on the next page, right? Which section explicitly uses the definition of proprietary information, which again, refers back to developed in the R&D programs. What this section, that the appellant is apparently now basing its entire argument on, 9A, says, is that the developer has an obligation to do certain things. During the term of this agreement, the developer is obliged to at least exercise good faith discretion in deciding whether to apply for patents. And the broad category of patents as to which that obligation applies is patents and inventions resulting from, right? That's not a grant. That's saying that's an obligation imposed upon into the area, the developer. And then it follows on for clarification, which they do in all of these agreements pretty much whenever they talk about patents, to say, provided however, provided however, and that second clause of 9A, provided however clause, is the one that is, if anything, an assignment to you. The first clause with the language resulting from is absolutely not an assignment. And when we look at the part of this that is arguably an assignment, the provided however clause, it says, as they always do over and over again in these agreements, it refers only to things that form a part of the proprietary information. In other words, that maps back to the same set of definitions, things that are developed in the R&D program. And it's totally undisputed. It was undisputed below. Rubenstein's contribution was not developed in the R&D program, and therefore, it's not proprietary information. And they don't get it. Now, Mr. Hanlon said it was very important and illustrative to look at the language of the option in the so-called TOS agreement. And I agree with that. I absolutely agree with that. And that language appears in the record, your honors, at page 4209 of my news stories. And it's section 5 of the TOS agreement, and what it said. And the purpose of this, the reason this is important is because, in together, the developer wants and indeed needs to have a mechanism to obtain from IBEP everything that IBEP has got. Why is that? Because InterJEDA has in turn promised that it will deliver everything back to JEDA, a separate organization. And that is found in the JEDA agreement, which is also in the record. And should the court get a look, it's at 4069 and 4070, particularly 4069. And what this option says, and interestingly, this option doesn't just relate to products reduced to practice. Reduced to practice, by the way, is its own special definition, separate apart from the normal patent law definition. It says, in respect of which a patent application has been filed prior to the expiration or termination of the sub-R&D agreement. So to the extent it talks about patents, the option talks just about ones that were filed before December 1987 when the sub-R&D agreement expired. It doesn't talk about ones like the application that is in this case that were filed after that date. Why is that? Because a separate part of the TOS agreement deals with applications like this one that were filed after the expiration of the sub-R&D agreement. That is section 9B of the TOS agreement in the record at page 4214. And that says, if we have a patent application filed after the sub-R&D agreement is expired, JEDA can qualify for royalties. The royalties will be diluted. And, Judge Bryson, for example, in the court's hypothetical, you'd get half. You'd get half, right? It doesn't give them ownership. Why does it not give them ownership? Because it's not consistent with their having ownership. If they had ownership, there wouldn't be a provision to be paid here. And the reason this provision is in there is because the way the parties contemplated this whole deal, patent applications filed after the termination of the sub-R&D agreement would never pass to the partnership, to IDEP. It would never belong to IDEP. And to the extent that they might embody some information that had been developed on IDEP's nickel, if you will, that information would fall within the bucket that the agreement's called residual proprietary information. And there is an option to purchase that. So you would then reunify all of the ownership back in together, and there would be, to the extent that the residual proprietary information had been baked into a patent application or merged, there would be a royalty obligation with the appropriate dilution provisions to take account of who contributed what. And that was the regime. What provision does, what's the relevance of Section 10, the property rights provision under A, which talks about future, you know, all persons employed by it presently in the future. What is the relevance of that provision to what we're talking about? The relevance, I think that's the basic grant provision in the sub-R&D agreement. I think Section 9 is not the grant provision. It includes this assignment only for avoidance of doubt. But the fundamental provision that's conveying rights is Section 10. That's why it's the property rights. And that's why we're saying this partnership, this is what should be it. Now, just to talk about, to follow up on a couple of other points, and I'm not sure how I'm doing on time. You're fine. OK. Thank you. The, insofar as the question of resulting from was it raised below, it was not raised. It's not, Your Honor, it's certainly possible to scour the briefs below that argument wasn't raised. We are not standing here suggesting that the appellee should prevail on this because it wasn't raised below, although that may be a valid outcome. But it certainly wasn't raised below, and we submit it's not fair to the district court to fault the district court for not having addressed an argument that was never put in front of it. With respect to Rubenstein and who he worked for, again, that issue is potentially in play. It was we, when we moved below, did not make it the focal point of our argument  is only to things that are developed during the R&D programs. And since he made this invention after the R&D programs were over, it didn't matter who he worked for. But if we're going to look at this kind of, these new arguments that have been raised by IBEP now in appeal, one of the things that was striking to us when we looked at IBEP's briefs in this case is that they're virtually devoid of references to what the district court did. They are now therefore wholly new arguments. If we look at those arguments, one of them that they make is a sort of aggregation argument where they say, well, even if we didn't get Rubenstein's piece because it didn't result from, or it didn't come up, and it wasn't made in the R&D programs, we got it later on when it was incorporated into a patent, which also included some things that were created in the R&D programs. And if, and that's a new argument, right? But if you're going to look at that argument, then it becomes fundamentally important to trace the chain of title of Rubenstein's interest, right? And so it's not, it raises not just the question of when that was created, but also where did it go once it was created? And what happened, and if we're going to look at that, what we see here is as a matter of undisputed fact. Rubenstein was working two jobs at the relevant time. He was, yes, it is certainly true that he was working for Intieto. He was also simultaneously continuing in his job as a professor at the Weizmann Institute. Wait, are you talking before the expiration in 87? He actually assumed his job, he worked full-time at the Weizmann Institute before the expiration until about September of 87, and then he began to split his time, so it was a short overlap of a few months when he was splitting his time, then the sub-R&D agreement expired, and he continued to split his time after that. I'm confused what you're doing. You're telling us pieces of the record now that would defeat a resulting from argument? They would defeat an aggregation argument by saying that Rubenstein's piece, even if it was separately owned, once it got folded into this patent application, because the patent application also included something else that belonged to IVEC, ipso facto, everything in the patent application then belonged to IVEC. But that's different than the resulting? That is different from the resulting from argument, yes. That's what I would categorize as an aggregation argument, saying even if we don't win on resulting from, we still win, because you took, even if this was, let's assume hypothetically, you could have filed a separate patent application and you people would have owned that. But when you didn't, and you took it and you put two things together, we got the lot. And I would call that an aggregation argument. I would say that that appears to be at least some part of what IVEC is arguing now. It wasn't argued below, but to the extent that they are making that argument, there's a fatal flaw in it, namely there's no good chain of title of Rubenstein's interests here, because he worked two jobs, and so you would have to know in which capacity he was working when he made this invention, and the record is silent on that. Had it been raised below, the record would have been fleshed out, but it wasn't. And second of all, if you look at the nature of the relationship between JEDA and inter-JEDA, and I apologize, Your Honor, for the confusing nature of these, but they are two separate entities. We've been through this once, at least two-thirds of us have been through this once. Many of us on this side of the bench have also been through it, Your Honor. But if we look, for example, in the record at page 4069, the so-called JEDA agreement between JEDA and inter-JEDA, in the section that deals with ownership there, it talks about property rights. When the sub-R&D agreement is terminated, property rights to anything that happens after that will be vested in JEDA, not inter-JEDA. And therefore, had this issue been properly raised and ventilated in the district court, what you would see is, in fact, Rubenstein's interest never passed to inter-JEDA. And in fact, this patent application was not filed by inter-JEDA. Why would we even get into all of this? I hope you would not, Your Honor. But the reason would be because ITAC raises it now and then. This is the aggregation? This is the aggregation. Speaking of the prior appeal, I think this may have come up there too. I mean, both briefs are marked confidential. I didn't ask the other counsel about it. I mean, this is all stuff that happened close to 20 years ago. What is the basis for the markings of confidentiality here? I can speak only on behalf of my client, Your Honor, but the only thing that my client would consider confidential is there is some much more recent information, a very little smattering of it, about how these inventors divided up the royalties amongst themselves. That doesn't sound like it's likely to come up. As far as my client is concerned, other than that, there is absolutely nothing in this record. And that is reflected in the markings you had in the confidential brief, or that's your view now? That's my client's view now. Okay, well, my question goes to the markings in the confidential brief and whether they're necessary. So are you prepared to say whether they are limited to what your position is now on the common mind? Anything other than that can freely be disseminated to the public. The only reason for that concern is that it's maybe a privacy issue. Actually, yours are fine. Yeah, we'll inquire into the other counsel. I'm happy to answer any other questions the court may have, but that will conclude my remarks. Thank you, Mr. Kruger. Thank you. Ms. Rudolph. Can I please be brief? I'll try to keep my remarks brief. I just have two points, and then I'll answer your question about the confidential nature as well. I first want to start with stepping back a little bit and looking at the nature of the relationship between these two parties, IBEP or I-B-E-P, and INTERYEDA, and how is that relationship defined? That relationship is defined by two contracts, the sub-R&D contract and the TOS agreement. The sub-R&D contract is a limited-term contract. It's only five years. The other agreement, the TOS agreement, is longer, so the parties contemplated that someone would be doing additional research, and, in fact, there's a right of first refusal in the TOS agreement if IBEP wanted to fund that additional research. But the point is that the patent assignment and the proprietary information that is developed in the sub-R&D agreement that governs what they own. There's a clear intent here that they are only providing funding for five years and they get research results for five years, and that's it. And anything that is developed during that five-year term, they own. But that contract then ends. The TOS agreement then, which extends farther in length, then governs the relationship with the parties going forward based on the results that had been obtained in the five years. So if you look at the Section 13, for example, of the TOS agreement, it's very clear that what they're saying is IBEP only gets the proprietary information developed during the sub-R&D agreement, and that's expressly set forth in the contract. And there are other provisions that Mr. Groombridge mentioned that support that idea that all IBEP is entitled to is what was developed during the term of the sub-R&D agreement. The second point I wanted to raise was to clarify something that IBEP has raised in its brief, although he didn't really expressly discuss it here, and that is in order to fit the entire 701 patent within the framework of the sub-R&D agreement, IBEP has argued that the appellees don't dispute that TBP, whatever that means, was discovered no later than 1987. And that statement's just not accurate. They're using that term TBP to cover everything that's in the 701 patent and obscuring the difference between the subject matter of Claims 2 and 3 versus what was claimed in Claim 1. And the subject matter of Claims 2 and 3 is indisputably a different invention because it has a different inventive entity. And the nomenclature can be a little confusing. I just want to take a minute to go through that. In 1987, the original three inventors discovered something in urine that binds TNF, and they called it TBP, TNF-binding protein. At that time, they didn't know how many proteins were in urine that were exhibiting that activity. In 1988, Dr. Rubenstein started working on the project, and thanks to Dr. Rubenstein, they were able to substantially purify and partially sequence a particular protein that had that activity. Now, at that time, they did not realize that there was more than one protein in urine that would have a similar activity of binding TNF, so they continued to call it TBP. Later, they discovered that there was a second protein, and at that point they renamed the original protein TBP-1, and they called the second protein TBP-2. So the point to keep in mind is that whatever you call it, that the inventors did not have the subject matter of claims 2 and 3, the substantially purified, partially sequenced protein that's claimed in claims 2 and 3 until 1988. If you took a resulting from tests, though, would there be enough information in the record to send it back for trial? No, there should be no dispute that what they, or there should be no dispute. It's very clear from the undisputed facts. If you look at these contracts, the resulting from cannot mean an invention that was created wholly outside of the sub-R&D agreement. The language of the contract is clear. It's limited to proprietary information. Proprietary information is developed in the sub-R&D agreement, and proprietary information is the phrase that limits that assignment. So resulting from cannot capture inventions that were made after... You would say it wasn't a causation. Pardon me? Something that flowed from the original invention, flowed into these other inventions. You would say not to interpret it that way. That's correct, and if you look at the TOS agreement, that's the only way you can interpret it, namely to mean not resulting from in the way that Mr. Hanlon would argue. What the TOS agreement contemplates is shared royalties, there's a right of first refusal for going forward with additional R&D. If they refuse to provide funding, then a third party can step in. So basically, no matter how you look at that contract, there's no way it can capture a later invention. Since you can't capture the later invention from which Dr. Rubenstein had an inventive contribution, they cannot lay claim to his inventive contribution, and they cannot lay claim to sole ownership of the patent. Very well, thank you. And your point on the confidential marking from the paper? There's no ANGEN or Y confidential information in the appendix, so from our point of view, there's nothing that would need to remain confidential. Now, I guess we have another group of parties, unfortunately, we have a lot of parties here, and there's another group of parties that did not file a separate brief. Everyone is represented here in court today, Your Honor. Fine. So your representations, or perhaps someone else can make a representation with respect to the Interlab, Serrano parties, now only as to the problem of confidential information. Your Honor, Wayne Varsity gives me no pressure on behalf of Interdata and Serrano interviews in this matter. If I may have 30 seconds. Of course, why don't you approach the lectern so that your comments can be recorded. I shall. This is one of those nightmares we have where you get called out of the audience to argue a case. It's a hot quiz. Wait until we start asking questions. Good afternoon, Your Honors. On behalf of Serrano and Interdata, intervenors in this action, we don't have any objection to any of the information in any of the briefs being released publicly. Very well. Thank you very much. And now I guess both your rebuttal and also if I forget it, I guess just a personal reminder, but we also want to hear your views as to the confidential materials problem. First, as to the confidential materials, I completely agree with the comments of Judge Brooks. This material is over 20 years old. I don't believe it's confidential. Okay, I think we have a good idea of what the parameters are on our commission to refer to things that may be marked but have not been asserted as important to protect. So go ahead. Why don't we give you three minutes? First of all, I want to once again refer to the option to purchase in the TAS agreement, but before I do that, I want to make it clear that the TAS agreement essentially only triggers if the option to purchase is exercised. That is, all of the subsequent paragraphs after paragraph five really have no relevance because the option was never exercised. But Mr. Groombridge made a few comments about the scope of the option, and he talked about how it actually covers patent applications which had been filed prior to the expiration or termination of the sub-R&D agreement, but those only refer to residual proprietary information. This is on page 4209. I was referring to the option to purchase in paragraph 5A that says, the partnership hereby grants inter jata, the option to purchase all the partnerships, partnerships, rights, title, and interest in and to the proprietary information relating to each product that has been reduced to practice. That's the scope of the option to purchase that inter jata has. So obviously then, that mirrors what the assignment... That sentence, just for clarification, or the sentence doesn't add an end there. No, no, no, it doesn't. But that deals with a different situation involving residual proprietary information. You see? It says, or in respect to which a patent application has been filed to the expiration or termination of the sub-R&D agreement, in and to residual proprietary information. So that's really not an issue here. The only issue is whether or not the scope of the patent assignment in the sub-R&D agreement mirrors the option to purchase. And it clearly does, because it looks at essentially what happens in order to commercialize the product, because reduced to practice is defined on page 4207, and it talks about the product being produced. So the idea was that IBEP would own all of the inventions resulting from the R&D programs, including commercialization, which included purifications. Rubenstein said that. He was very clear about that. And then inter jata would have an option to purchase those discoveries. I mean, there's perfect symmetry here. And what they're trying to do is basically just cut off discoveries as if this was some academic institution that we were funding. And that's simply not the case. Also, we have evidence in the record to show how important the work done on purification was during the sub-R&D agreement. I mean, Dr. Engelman himself testified that he worked in 1987 and 1988 with both Dr. Wallach and Dr. Rubenstein in order to purify TBP. I mean, this clearly was a continuum, a process that they were building upon to commercialize discoveries owned by IBEP. And that really was the gist of the agreement. Now, referring again to the sub-R&D agreement, again, Mr. Brubridge just started by saying, well, the first part isn't a grant. And then he says, well, it's just inter jata shall apply for and obtain patents. That introductory phrase, on behalf of the partnership, is really important because it really lays out how that assignment has to be interpreted. And it has to be interpreted for the benefit of IBEP. And it has to take into account that without IBEP's funding, there was no research. Nothing happened. I'm sorry. I'm sorry. Were you... I didn't want to cut you off in the middle of a point. Was that the last that you had? Actually... If you have one more point, why don't you make it? We've given you additional time. I do have one more point, and then I will sit down. All right. Again, the... As Randolph said, or Rudolph said, that the Rubenstein invention was wholly outside of the sub-R&D agreement. Again, I would refer the court to Wallach's memo laying out the contributions of the inventors. I think that's at 41-49, I believe, where he specifically talks about all that was done before Rubenstein joined the project. And, as a result, Rubenstein was entitled to just a very small royalty percentage. Thank you. Thank you. And thank both... well, all three... all four counsel. And the case is submitted. Thank you. All rise. The audible court is adjourned until tomorrow morning at 10 o'clock.